**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 08-20021** |
| | ) | |
| **DALE MARDIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO DISMISS
INDICTMENT FOR VIOLATION OF THE SEPARATION OF POWERS**

Before the Court is Defendant Dale Mardis's ("Defendant") Motion to Dismiss Indictment for Violation of the Separation of Powers filed on March 10, 2009. (D.E. #128.) The Government filed its response in opposition on March 25, 2009, and Defendant filed a reply two days later on March 27th. The Court then referred this motion to the United States Magistrate Judge for a report and recommendation. On July 21, 2009, the Magistrate Judge recommended denial of Defendant's motion. (D.E. #179.) Defendant filed his objections to the Magistrate Judge's report and recommendation on August 4, 2009. For the reasons stated herein, the Court **OVERRULES** Defendant's objections, **ADOPTS** the Magistrate Judge's report and recommendation, and **DENIES** Defendant's motion.

**I. BACKGROUND**

**A. General Factual Background**

In 2001, a federal grand jury in the Western District of Tennessee convened to investigate the disappearance of Mickey Wright, a Memphis and Shelby County Codes Enforcement Officer.   A task force comprising federal and local law enforcement agencies uncovered evidence indicating that Mr. Wright disappeared on April 17, 2001 and that his last known location was on property owned by Defendant in Memphis, Tennessee.  While there, Mr. Wright appears to have written a "courtesy" citation as part of his duties.

This first federal grand jury ultimately did not return charges against any individuals.  State authorities investigated the matter while federal prosecutors held in abeyance further investigation of potential violations of federal law.  After concluding its investigation, the State of Tennessee indicted Defendant for first degree murder and sought the death penalty.   In the week before Defendant's state court trial was to commence, Defendant and the State of Tennessee reached a tentative plea deal whereby Defendant would plead nolo contendere to second degree murder and serve a sentence of 13.5 years incarceration.   After Defendant's attorney contacted the U.S. Attorney's Office concerning potential federal charges, Defendant agreed to a sentence of 15 years in order to resolve a contemplated federal firearms charge.

Accordingly, on April 5, 2007, Defendant entered a nolo contendere plea to the charge of second degree murder in the Criminal Court for Shelby County (Tennessee) and was sentenced to 15 years in prison to be served at 100%.  The prosecutor for the State of Tennessee required as a condition of the plea agreement that Defendant reveal

what happened to Mr. Wright's body so that his family might obtain some sense of closure. To satisfy this requirement, Defendant's attorney handwrote a note describing the disposition of Mr. Wright's remains. The note does not mention Defendant or how Defendant's attorney obtained the information.

A subsequent federal investigation commenced, and a second federal grand jury was impaneled. This grand jury indicted Defendant on January 30, 2008 for civil rights murder in violation of 18 U.S.C. § 245 and for using a firearm to accomplish the alleged murder in violation of 18 U.S.C. § 924(j). The federal indictment currently pending charges that Defendant murdered Mr. Wright on account of his race and color[1] as well as on account of Mr. Wright's employment by a governmental entity. Defendant faces the possibility of a death sentence if he is convicted.

Defendant moves the Court to dismiss this indictment because of actions allegedly taken by United States Representative Steve Cohen of Tennessee's Ninth Congressional District[2] ("Congressman Cohen") to cause the Government to bring federal charges against Defendant.

**B. Defendant's Assertions as to Congressman Cohen**

According to the allegations contained in Defendant's motion and his objections to the Magistrate Judge's report and recommendation, Congressman Cohen actively sought a federal indictment of Defendant following Defendant's state court guilty plea in April 2007. Defendant contends that the Wright family contacted Congressman Cohen, who was still in his first term at the time. Congressman Cohen then allegedly contacted

---

[1] Mr. Wright was African-American, while Defendant is white.

[2] Congressman Cohen was first elected to Congress in 2006 and was reelected in 2008. See Stephen Cohen—Biography, http://bioguide.congress.gov/scripts/biodisplay.pl?index=C001068 (last visited Nov. 20, 2009).

the FBI and the U.S. Attorney for the Western District of Tennessee about the matter. Congressman Cohen, Defendant states, held a press conference at which he publicly promised to assist the Wright family in obtaining a federal prosecution of Defendant. Congressman Cohen was then, and is currently, a member of the U.S. House Judiciary Committee and its Subcommittee on the Constitution, Civil Rights, and Civil Liberties.

Defendant contends further that in the 2008 election, during which Congressman Cohen faced two African-American opponents in the Democratic primary, the Congressman publicly touted his assistance to the Wright family.   Specifically, Defendant states that Congressman Cohen mentioned the federal prosecution of Defendant on his campaign website and that during a televised debate with his primary opponents, the Congressman referred to the federal prosecution of Defendant as one of his accomplishments during his first term.   Congressman Cohen also introduced legislation in the U.S. House titled the "Mickey Wright Act," which would have criminalized the transportation of the corpse of a homicide victim across state lines with the intent to prevent the body's use as evidence.  See Mickey Wright Act, H.R. 3386, 110th Cong. (2007).  Defendant makes no specific allegation that Congressman Cohen ever explicitly threatened federal officials in order to secure Defendant's federal prosecution, though Defendant does generally assert that the Congressman "used his political stature to coerce" federal prosecutors into pursuing charges against Defendant. (Def.'s Mot. to Dismiss at 5.)

The Government does not dispute that Congressman Cohen engaged in the specific actions alleged by Defendant.   Rather, the Government contends that, even assuming all of Defendant's allegations about Congressman Cohen to be true, there was

no separation of powers violation. Similarly, the Magistrate Judge's report and recommendation also assumed Defendant's allegations to be true for purposes of deciding this motion and concluded that Congressman Cohen's actions did not violate the Constitution's separation of powers.

## II. LAW AND ANALYSIS

### A. Separation of Powers

Unlike many state constitutions,[3] the United States Constitution does not have an express provision mandating the separation of powers among the branches of government. See Nat'l Mut. Ins. Co. of Dist. of Columbia v. Tidewater Transfer Co., 337 U.S. 582, 590-91 (1949) ("The doctrine of separation of powers is fundamental in our system. It arises, however, not from Art. III nor any other single provision of the Constitution, but because behind the words of the constitutional provisions are postulates which limit and control.") (internal quotation marks and citation omitted). Nevertheless, the separation of powers has long been recognized as part of the federal constitutional system. See, e.g., Humphrey's Ex'r v. United States, 295 U.S. 603, 629-30 (1935); O'Donoghue v. United States, 289 U.S. 516, 530-31 (1933); Massachusetts v. Mellon, 262 U.S. 447, 488-89 (1923); United States v. Am. Bell Tel. Co., 128 U.S. 315, 357-58 (1888); Kilbourn v. Thompson, 103 U.S. 168, 190-91 (1880) ("[T]he persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to

---

[3] See, e.g., Ariz. Const. art. III; Ark. Const. art. 4, §§ 1-2; Cal. Const. art. III, § 3; Colo. Const. art. III; Ga. Const. art. I, § II, ¶ III; Fla. Const. art. II, § 3; Ill. Const. art. II, § 1; Me. Const. art. III, §§ 1-2; Mass. Const. pt. 1, art. XXX; Minn. Const. art. III, § 1; Nev. Const. art. 3, § 1; N.H. Const. pt. I, art. 37; N.J. Const. art. III; N.M. Const. art III, § 1; N.C. Const. art. I, § 6; Okla. Const. art. IV, § 1; Tenn. Const. art. II, §§ 1-2; Tex. Const. art. 2, § 1; Utah Const. art. V, § 1; Vt. Const. ch. II, § 5; Va. Const. art. I, § 5; W. Va. Const. art. V, § 1.

the exercise of the powers appropriate to its own department and no other."); cf. Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 569-70 (1832).

While the United States Supreme Court has at times described the separation-of-powers doctrine as requiring each branch to operate "entirely free from the control or coercive influence, direct or indirect, of either of the others" Humphrey's Ex'r, 295 U.S. at 629, recent jurisprudence has clearly adhered to a more flexible view of the doctrine. In so doing, the Supreme Court has "recognized, as [James] Madison admonished at the founding that the Framers did not require—and indeed rejected—the notion that the three Branches must be entirely separate and distinct." Mistretta v. United States, 488 U.S. 361, 380 (1989) (citing Nixon v. Admin'r of Gen. Servs., 433 U.S. 425, 443 (1977) and United States v. Nixon, 418 U.S. 683 (1974)). This flexible position holds that one branch of the federal government need not exercise its power totally uninfluenced by the others. Morrison v. Olson, 487 U.S. 654, 693-94 (1988) ("[W]e have never held that the Constitution requires that the three branches of Government operate with absolute independence.") (internal quotation marks and citation omitted); see United States v. Nixon, 418 U.S. 683, 707 (1974); Nixon v. Admin'r of Gen. Servs., 433 U.S. 425, 442-43 (1977) ("[T]he [Supreme] Court squarely rejected the argument that the Constitution contemplates a complete division of authority between the three branches."); see also Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 220-24 (1821) ("The different departments of the government could not be divided in this exact, artificial manner. They all run into each other."). As Justice Jackson observed, "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but

interdependence, autonomy but reciprocity." <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

Notwithstanding the adoption of this flexible view, the doctrine of separation of powers remains a vital and important limitation on government—a limitation the courts have readily enforced. <u>See</u> <u>INS v. Chadha</u>, 462 U.S. 919, 951 (1983) ("The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted."); <u>see also</u> <u>Morrison</u>, 487 U.S. at 693 ("We have not hesitated to invalidate provisions of law which violate this principle."); <u>cf.</u> <u>New York v. United States</u>, 505 U.S. 144, 182 (1992).  In considering whether the doctrine of separation of powers has been violated, the courts are called upon to apply a sophisticated system of checks and balances designed to safeguard the structural integrity of a tripartite government.  <u>Mistretta</u>, 488 U.S. at 381. Preservation of this system of checks and balances requires the courts to invalidate actions "that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch." <u>Id.</u> at 382; <u>see</u> <u>Buckley v. Valeo</u>, 424 U.S. 1, 122 (1976) ("This is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch.") (quoting <u>Hampton & Co. v. United States</u>, 276 U.S. 394, 406 (1928)).  Because the object of the doctrine is nothing less than the preservation of political liberty, courts must not easily dismiss concerns that one branch of government has impermissibly encroached upon or diminished the powers of another.  <u>See</u> <u>Clinton v. City of New York</u>, 524 U.S.

417, 452 (1998) (Kennedy, J., concurring); see also Boumediene v. Bush, 128 S. Ct. 2229, 2246 (2008) ("The Framers' inherent distrust of governmental power was the driving force behind the constitutional plan that allocated powers among three independent branches.").

**B. Defendant's Objections to the Report and Recommendation**

Defendant presents three objections to the Magistrate Judge's report and recommendation. First, Defendant argues that Congressman Cohen's actions constituted official interference in the affairs of the executive branch. Second, Defendant contends that the cases cited and relied upon in the report and recommendation are distinguishable from the instant case. Third, Defendant urges the Court to reject the Magistrate Judge's characterization of Congressman Cohen's actions as "constituent service."

### 1. Reliance on Precedent

Considering Defendant's second objection first, the Court agrees with Defendant that the case law cited in the report and recommendation comes from cases that are distinguishable from the factual dynamic in the present case. Indeed, no party has cited a case with a similar set of facts, and the Court is aware of no precedent squarely on point. Rather, the Court is left to consider Defendant's arguments in light of the general jurisprudence regarding the separation of powers that has been articulated and developed in prior cases.

### 2. Legislative Interference with the Executive

In his first objection, Defendant correctly notes that in Bowsher v. Synar the Supreme Court stated that "[t]he Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of law it enacts." 478

U.S. 714, 722 (1986).  In <u>Bowsher</u>, the Supreme Court considered the constitutionality of the Balanced Budget and Emergency Deficit Act and held that the Comptroller General could not be entrusted with executive power—specifically, the power to direct reductions in federal spending—because Congress had retained the authority to remove the Comptroller General from office.  <u>Id.</u> at 731-34.  "By placing the responsibility for execution of the Balanced Budget and Emergency Deficit Control Act in the hands of an officer who is subject to removal only by itself, Congress in effect . . . retained control over the execution of the Act and . . . intruded into the executive function."  <u>Id.</u> at 734. The Supreme Court held Congress's retention of such authority unconstitutional.  <u>Id.</u> at 736.

The kinds of actions at issue in <u>Bowsher</u> differ greatly from the actions allegedly taken by Congressman Cohen in the present case.  <u>Bowsher</u> involved a statute by which an officer of Congress could command the President himself to take action.  <u>Id.</u> at 733 ("Indeed, the Comptroller General commands the President himself to carry out, without the slightest variation . . . the directive of the Comptroller General as to the budget reductions[.]").  There is no such statute in the instant case, nor does this case involve any other official action by Congress, such as investigative hearings or passage of a nonbinding resolution.  Instead, the actions in question are those of a single legislator.

Defendant argues that the Court should be guided by the Third Circuit's decision in <u>Winsett v. McGinnes</u>, 617 F.2d 996 (3d Cir. 1980).  Although <u>Winsett</u> involved actions by legislators which were found to have influenced prison officials in determining whether to grant an inmate work release, the case centered on the question of whether officials violated the inmate's due process rights when they denied his application, even

though he had satisfied all of the criteria established by state law, because they feared negative public reaction and legislative reprisals.  Id. at 1007-08.  Winsett did not involve questions of separation of powers, let alone the question of whether a decision to prosecute was tainted by a violation of the separation of powers, and the Court finds that it does not support Defendant's argument that Congressman Cohen's actions were improper.

Defendant has cited no case in which the actions of an individual legislator, as opposed to a legislative body or even a single chamber, were found to violate the Constitution's separation of powers, and the Court is dubious that an individual legislator's interaction with executive branch officials could ever interfere with the authority of the executive in a way that would violate the separation of powers.  To conclude otherwise would risk stifling the kind of interaction with the executive by legislators that the courts have countenanced as among the sundry activities frequently undertaken by congressmen and senators.  See Gravel v. United States, 408 U.S. 606, 625 (1972) ("Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute[.]"); see also United States v. Brewster, 408 U.S. 501, 512 (1972) (including in a list of "legitimate 'errands' performed [by congressmen and senators] for constituents, the making of appointments with Government agencies"); Sierra Club v. Costle, 657 F.2d 298, 409-10 (D.C. Cir. 1981) ("We believe it entirely proper for Congressional representatives vigorously to represent the interests of their constituents before administrative agencies. . . [A]dministrative agencies are expected to balance Congressional pressure with the pressures emanating from all other sources.");

Newell v. Brown, 981 F.2d 880, 886-87 (6th Cir. 1992) ("In writing to the Department of Corrections on behalf of his constituent, . . . Congressman Schuette was simply providing the kind of 'constituent service' that every member of Congress renders routinely upon request.").

Generally, informal legislative pressuring of the executive for certain action—particularly from a lone legislator—does not itself result in any assumption of executive power or in legislative domination of the executive.  In some circumstances, namely quasi-judicial proceedings before administrative agencies, pressure from congressmen and senators violates the due process rights of the parties involved.  See ATX, Inc. v. U.S. Dep't of Transp., 41 F.3d 1522, 1527-28 (D.C. Cir. 1994); Pillsbury Co. v. Federal Trade Comm'n, 354 F.2d 952, 962-965 (5th Cir. 1966); cf. Winsett, 617 F.2d at 1007-08. In other situations, including the development of an administrative agency's broader policies, there exist far fewer restrictions, and even then the limitations on contact by members of Congress typically arise from the Administrative Procedure Act or the requirements of due process rather than from concerns specific to the Constitution's separation of powers.  See DCP Farms v. Yeutter, 957 F.2d 1183, 1187-88 (5th Cir. 1992); Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs, 714 F.2d 163, 169-71 (D.C. Cir. 1983); Sokaogon Chippewa Cmty. v. Babbitt, 929 F. Supp. 1165, 1175-76 (W.D. Wis. 1996).

Legislators routinely express their opinions to executive branch officials about matters for which their departments or agencies are responsible.  See Gravel, 408 U.S. at 625; DCP Farms, 957 F.2d at 1187-88; Sierra Club, 657 F.2d at 409-10; SEC v. Wheeling-Pittsburgh Steel Corp., 648 F.2d 118, 126 (3d Cir. 1981) (en banc) ("[W]e

cannot simply avert our eyes from the realities of the political world: members of Congress are requested to, and do in fact, intrude, in varying degrees, in administrative proceedings.").  Defendant's position presumes that executive officials must disregard these views and remain entirely free of their influence in order to maintain the separation of powers, but this is impracticable, unnecessary, and bears no relation to the actual workings of the modern administrative state.  See generally Jack M. Beermann, Congressional Administration, 43 San Diego L. Rev. 61, 62-144 (2006) (discussing ways Congress influences decisions and policies of administrative agencies); Mark Seidenfeld, The Psychology of Accountability and Political Review of Agency Rules, 51 Duke L.J. 1059, 1075-91 (2001) (discussing mechanisms through which Congress influences agency decisions).  Furthermore, the adoption of Defendant's conception of the separation of powers would surely hinder legitimate congressional oversight of executive agencies.[4]  See Watkins v. United States, 354 U.S. 178, 187 (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process . . . It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes . . . [and] . . . comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste."); Sokaogon Chippewa Cmty., 929 F. Supp. at 1175 ("Communications between Congress and agencies help to

---

[4] Defendant's position would also call into question the constitutionality of the statute by which an individual may be criminally prosecuted for contempt of Congress.  See 2 U.S.C. § 192 (criminal penalties for witness refusing to comply with summons to appear before Congress or for "refus[ing] to answer any question pertinent to the question under inquiry").  These charges are initiated when the presiding officer of the appropriate house of Congress certifies a statement of fact describing the individual's contumacious conduct and transmits that statement to the appropriate United States Attorney, who then brings the matter before a grand jury.  See 2 U.S.C. § 194.  Formal steps by Congress are a prerequisite to a prosecution for this charge.  See Ex parte Frankfeld, 32 F. Supp. 915, 916-17 (D.D.C. 1940).  This process certainly involves more formal conduct by the legislative branch than is alleged to have taken place in the instant case, but the courts have never suggested that Congress's role in the initiation of contempt charges violates the separation of powers.  See generally Russell v. United States, 369 U.S. 749, 753-63 (1962) (discussing extensively contempt of Congress).

guarantee the political accountability of unelected agency decisionmakers."). This interaction among the branches is simply part of the vigorous engagement that gives rise to the system of checks and balances in our government. Cf. generally The Federalist No. 47 (James Madison). As the Supreme Court has said, "Separation-of-powers principles are vindicated, not disserved, by measured cooperation between the two political branches of the Government, each contributing to a lawful objective through its own processes." Loving v. United States, 517 U.S. 748, 773 (1996); see also Mistretta, 488 U.S. at 381.

Additionally, a prosecutor's decision whether to seek criminal charges is very different from formal administrative proceedings intended to be quasi-judicial in nature. See Inmates of Attica Corr. Facility v. Rockefeller, 477 F.2d 375, 379-82 (2d Cir. 1973) (discussing nature of prosecutorial discretion and noting difference between the decision to prosecute and review of other administrative acts of executive officials). A prosecutor enjoys wide discretion in making prosecutorial decisions. Wayte v. United States, 470 U.S. 598, 607 (1985). Although a prosecution may not be motivated by race, religion, or other impermissible criteria (including an individual's exercise of protected rights), id. at 608, provided "the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978); see United States v. Armstrong, 517 U.S. 456, 464-65 (1996); see In re United States, 503 F.3d 638, 642 (7th Cir. 2007) ("Exercises of prosecutorial discretion may be overseen only to ensure that the prosecutor does not violate the Constitution or some other rule of positive law."). Thus, it is not

appropriate to apply the standard applicable to quasi-judicial administrative actions to the exercise of prosecutorial discretion.

### 3. "Constituent Service"

Finally, Defendant argues that Congressman Cohen's actions cannot simply be characterized as a constituent service of the type engaged in by legislators on a daily basis. For support, Defendant points to language on the website of Congressman Dennis Moore of Kansas, which in discussing the constituent services that his office can provide says, "Unfortunately, because of the separation of the legislative and judicial branches of government, members of Congress are not permitted to intervene in matters pertaining to current criminal and civil legal proceedings." (Def.'s Objections to R&R at 10 (quoting language from Congressman Moore's website).)[5] Defendant also cites the websites of seven other congressmen, one U.S. Senator, and one Massachusetts state senator for their descriptions of constituent services—descriptions that do not include advocating for criminal prosecutions.

The instructiveness of these websites is very limited. Not only is an individual congressman's interpretation of what constitutes permissible constituent services, or even what constitutes a violation of the separation of powers, hardly controlling authority, but the decision of one congressman to abstain from becoming involved in certain proceedings also does not preclude another member of Congress from taking a different

---

[5] Of course, Congressman Moore's website speaks of "current" legal proceedings, but it is alleged in this case that Congressman Cohen acted prior to the initial of federal criminal charges and after the conclusion of state charges. Congressman Cohen thus appears to have satisfied the standard described by Congressman Moore. It also bears noting that there exists a well-established practice of congressmen and senators filing amicus briefs in legal proceedings, particularly in matters being considered by the U.S. Supreme Court, to express their views on the case to the court. See, e.g., Brief for Amici Curiae 55 Members of United States Senate, the President of the United States Senate, and 250 Members of United States House of Representatives in Support of Respondent, Dist. of Columbia v. Heller, 128 S. Ct. 2783 (2008) (No. 07-290).

view.  Moreover, Defendant acknowledges that a congressman's or senator's decision to assist a constituent in dealing with federal agencies—including the IRS, the Social Security Administration, the Department of Veterans Affairs, and the Department of Homeland Security—would not violate the separation of powers.  In providing assistance with these executive departments and agencies, a legislator often requests specific action on the constituent's behalf, and, of course, oftentimes this action could become the subject of judicial scrutiny if litigation were to result.  If the separation-of-powers doctrine permits a congressman to request that an executive official take steps to assist a constituent in resolving problems with an agency, the Court believes that it must also be permissible for a congressman to request that the Department of Justice investigate the possible commission of a federal crime.  Although the stakes in this case are much higher than in the typical example of constituent service, a legislator's interaction with the executive in each case is fundamentally the same and simply involves requesting action, in this instance, investigation by the executive branch.

## C. No Separation of Powers Violation

The allegations against Congressman Cohen amount to nothing more than contentions that he "cajoled" or "exhorted" the executive to seek federal charges against Defendant.  The Court finds that this conduct cannot amount to a violation of the separation of powers.  Congress's powers are not increased, nor are the executive's diminished, when an individual congressman urges criminal investigation or a federal prosecution.[6]  See Mistretta, 488 U.S. at 382.  The decision whether or not to pursue a

---

[6] Legislation seeking to compel a certain result or seeking to directly impose a punishment or penalty, of course, presents different considerations and would raise the question of whether the particular legislation constitutes a bill of attainder.  The Supreme Court has recognized that the Constitution's prohibition on

federal indictment by presenting evidence to a grand jury remains the exclusive province of the executive, irrespective of the pressure, if any, that an individual member of Congress may exert on prosecutors to act.

Contrary to Defendant's position, the Court finds that no evidentiary hearing is necessary because, even taking as true all of Defendant's allegations regarding Congressman Cohen's actions, no violation of the Constitution's separation-of-powers doctrine occurred.

## III. CONCLUSION

For the reasons stated above, the Court finds that Defendant's objections are not well founded.  The Court **ADOPTS** the Magistrate Judge's report and recommendation and **DENIES** Defendant's motion to dismiss for violation of the separation of powers.

**IT IS SO ORDERED**, this the 23rd day of November, 2009.

s/Bernice Bouie Donald
**BERNICE BOUIE DONALD**
**UNITED STATES DISTRICT JUDGE**

---

bills of attainder, see U.S. Const. art. I, § 9, cl. 3, implicates separation-of-powers concerns, see United States v. Brown, 381 U.S. 437, 442-47 (1965), but this issue is not presented in the instant case.