**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 08-20021 D/P** |
| **DALE MARDIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTIONS TO SUPPRESS**

---

Before the court by order of reference are several motions to suppress filed by defendant Dale Mardis: Motion to Suppress Evidence of Marital Communications Between the Defendant and His Wife, Patsy Mardis (D.E. 136), Motion to Suppress Evidence of Prior Identifications and Preclude Future In-Court Identifications by Sandra Gahagan (D.E. 137), and Motion to Suppress Adoption of Defendant's Wife's Statement as His Own Admission (D.E. 138). In addition, Mardis filed a motion styled Addendum to Defendant's Motion to Suppress Document Number 138 (D.E. 200) (hereinafter referred to as "Supplemental Motion to Suppress Statements"), in which Mardis seeks to suppress additional post-arrest statements not discussed in his other motions to suppress. The United States ("government") filed responses in opposition to each motion.

Pursuant to the order of reference, the court conducted a suppression hearing on the motions. At the hearing, the court

heard from Sandra Gahagan, former Federal Bureau of Investigation ("FBI") Safe Streets Task Force Officer James C. Paris, Shelby County Sheriff's Deputy James Mayes, and Shelby County Sheriff's Deputy Joe T. Everson.  A transcript of a recorded statement by Sandra Gahagan dated April 20, 2001, two composite sketches, a photo spread and attached procedures for identification, two FBI 302 reports dated May 17, 2001, and a CD containing the recorded statement of Patsy Mardis were admitted into evidence.

Based on the entire record, the court submits the following proposed findings of fact and conclusions of law, and recommends that the Motion to Suppress Evidence of Prior Identifications and Preclude Future In-Court Identifications be denied, the Motion to Suppress Adoption of Defendant's Wife's Statement and Motion to Suppress Evidence of Marital Communications be granted, and the Supplemental Motion to Suppress Statements be denied as moot.

## I.  PROPOSED FINDINGS OF FACT

### A.  Procedural History

A detailed description of the procedural history of this case can be found in United States v. Mardis, 600 F.3d 693, 694-96 (6th Cir. 2010), and United States v. Mardis, No. 08-20021 (W.D. Tenn. June 24, 2009), and is summarized below.  In 2001, a federal grand jury in the Western District of Tennessee convened to investigate the disappearance of Mickey Wright, a Memphis and Shelby County Code Enforcement Officer.  A task force comprised of federal and

-2-

local law enforcement agencies was formed to investigate Wright's disappearance. From April of 2001 through August of 2001, Shelby County Sheriff's Deputy James Mayes was the lead investigator, and FBI Safe Streets Task Force Officer James C. Paris assisted Mayes. In or around August of 2001, Mayes left the task force to attend the FBI Academy, at which time Paris took over as lead investigator.

The task force uncovered evidence indicating that Wright disappeared on April 17, 2001, and that his last known location was at the A Car Lot, a used car lot located on property owned by Mardis in Memphis, Tennessee. While there, Wright appeared to have written a "courtesy" citation. Wright's burned-out truck, badge, and identification card were later found in Mississippi. His body was not recovered. The 2001 federal grand jury, which heard evidence on charges of arson of a motor vehicle, interstate transportation of a vehicle, and a firearms charge, ultimately did not return charges against anyone.

The matter was further investigated by state authorities while federal prosecutors held in abeyance additional efforts to investigate potential federal charges. After its investigation, the State of Tennessee indicted Mardis for the first degree murder of Wright and sought the death penalty. On April 5, 2007, Mardis entered a *nolo contendere* plea in the Criminal Court of Shelby County to the lesser charge of second degree murder. He was

sentenced to fifteen years in prison with a stipulation that he serve the entire sentence.

A subsequent federal investigation commenced under the lead of Joe T. Everson, a Shelby County Sheriff's Deputy and Special Deputy U.S. Marshal. Assistant District Attorney General Tom Henderson, who prosecuted Mardis on the state charges, turned over his files on the Mardis case to the U.S. Attorney's Office, and Everson was assigned as a liaison to the federal investigation. A second federal grand jury was impaneled and returned an indictment against Mardis on January 30, 2008, for a civil rights murder in violation of 18 U.S.C. § 245, as well as for using a firearm to accomplish the murder in violation of 18 U.S.C. § 924(j). According to the federal indictment, Mardis murdered Wright on account of his race and color (Wright was African-American and Mardis is Caucasian), as well as Wright's employment by a governmental entity. The government later filed a notice of certification to prosecute Mardis under the civil rights statute, 18 U.S.C. § 245.

**B.   The Identification Made By Sandra Gahagan**

On April 17, 2001, the day of Wright's disappearance, Sandra Gahagan was working as the Director of Happy Times Daycare in Olive Branch, Mississippi.[1] Sometime around noon, Gahagan left the daycare to make a bank deposit and get lunch, and as she was

---

[1]Olive Branch is located in northern Mississippi, near the Tennessee-Mississippi border and in close proximity to Memphis.

leaving the daycare, she saw a white Memphis-Shelby County Code Enforcement truck parked next to the daycare. After returning to the daycare about thirty minutes later, Gahagan noticed that the truck was still parked next to the daycare, although it had moved from its prior position. Gahagan went inside the daycare to eat her lunch and do some work. Shortly thereafter, Gahagan went outside and noticed that the truck was still there. Concerned that the truck had been parked near the daycare for such a long time, Gahagan decided to approach the truck.

Gahagan approached the driver's side, stuck her head through the open window, and asked the driver why he was parked there. The driver stated he was waiting for someone. It appeared to Gahagan that the man was looking in the direction of Highway 78.[2] She told him she was concerned that he had been parked near the daycare for such a long time, to which he responded that he understood and "you can't be too careful these days." (Tr. at 22.)

While talking with the driver, Gahagan observed "something covered in a sheet" on the front passenger seat. (Id. at 34-35.) According to Gahagan, "[a]s I looked at it, my first thought was that looks like a body, it looks like someone that was like slumped over and someone had taken the sheet and completely covered the

---

[2]The daycare, at the time, was located at the intersection of Goodman Road and Highway 78 in Olive Branch. When Highway 78 crosses into Memphis, it becomes Lamar Avenue, the street where the A Car Lot was located.

body including the feet." (Id. at 35.) However, she did not immediately call the police or tell anyone about what she saw:

> Q.  On that day, was it your thought that it was a body or did that happen subsequent?
>
> A.   It was a fleeting thought because I thought, my gosh, that looks like someone slumped over and wrapped in a sheet, and I thought that for awhile and kind of had an uneasy feeling, and then I thought this is absolutely crazy, this man [the driver] is fine, he's talking to you, he's in a truck that says code enforcement officer, you're letting your imagination run away with you.

(Id. at 37.)  The conversation lasted approximately one or two minutes.  (Id. at 23, 26, 83.)  The truck remained parked at the same spot after Gahagan walked away, but was gone by later that afternoon.

On April 19, 2001, Gahagan was at home reading the newspaper when she saw an article about a missing Code Enforcement officer, which included a request that anyone who might have seen his Code Enforcement truck call Crimestoppers.  She called the Crimestoppers's number, and on April 20, she was contacted by Mayes.  Gahagan met with Mayes and gave him a statement describing the driver of the Code Enforcement truck:

> He was a big man.  He looked to be in his middle to late forties, he had [] gray, kind of salt and pepper hair, more towards the gray, [] his hair was parted down the middle.  It was [] probably down a little bit past his ears.  He was [] clean shaven, he was a clean looking man, he had on a button-down shirt.  I just remember it was light in color.  It might have been a stripe.  I'm not really certain.  I do remember it was short sleeve shirt.  He was [] very friendly, [] he didn't seem nervous.

(Ex. 1.)  Gahagan worked with law enforcement to produce two composite sketches of the driver.  (Ex. 2 & 3.)  However, Gahagan was not satisfied that either of the composites accurately depicted the man she saw.  Over the course of the next several months, Gahagan was shown "hundreds" of photographs as part of the investigation into Wright's disappearance, but she did not identify any of them as depicting the driver of the Code Enforcement truck.  (Tr. at 54.)  Eventually, the investigation went cold.

In 2004, Everson took over as lead investigator, and spent over a month reviewing the entire investigation file.  Based on his review of the file, Everson identified Mardis as a suspect.  Everson found only one photo spread in the file, but it did not contain a photograph of Mardis.  Instead, it contained a photograph of Roger Ventrini, another person associated with the A Car Lot.  Paris told Everson that he had shown the photo spread to Gahagan, but that she had not made an identification.  Although there was only one photo spread in the file, there were hundreds of individual photos, including "mug shots" of Mardis taken from a prior arrest.

In July of 2004, Everson called Gahagan, told her that he was investigating some cold cases, including the Wright case, and asked if she could look at a photo spread.  On July 7, 2004, Everson went to Gahagan's home to show her a photo spread:

> After I spoke with Ms. Gahagan and scheduled a time for
> myself and Agent Carter to go out there, we went out

there and talked to her a little bit about our investigation. I asked her that I wanted or recommended to her that I wanted to show her a photo spread of individuals that are either previously or presently incarcerated, that's who we got the mug shots for the display and that she was under no obligation to pick out anybody. And that I had her read – read this or read it to her, one or the other, we both read it, and asked her to sign it.

(Id. at 259.) Everson provided Gahagan with a form titled "ADVICE TO WITNESS VIEWING PHOTOGRAPHIC DISPLAY," which she read and signed. The form stated:

I have been advised that I will soon be viewing several photographs of individuals for purpose of identification. I understand that this is an important procedure, designed to clear the innocent as well as to insure accurate and reliable identification of the guilty. Accordingly, the procedures described below will be followed.

1. The photographic display will contain pictures of persons of similar description in similar poses.

2. There is no significance to the order in which the photographs will appear.

3. The persons pictured may or may not have anything to do with the subject offence and I am not to assume that the guilty party must be one of the persons represented.

4. During the viewing process, no one is to give me any hints or suggestions or attempt to influence my identification in any way.

5. If I make an identification, it will be done in writing.

6. I am to make no identification unless I am positive of such identification.

(Ex. 4.) The photo spread displayed six photographs of men of similar age and appearance, including a photograph of Mardis.

-8-

After Gahagan signed the form, she "looked at the photo spread and looked at it for about two or three minutes and then chose the individual in position number three, Mr. Mardis, as the subject that she recognized being in the Code Enforcement vehicle that day." (Tr. at 260.) Everson testified that "she kept coming back to the individual in position number three and started tapping her finger [] on that individual. And I think her exact words to me at that time were . . . this looks the most like the man I saw than any other photo I've seen." (Id. at 264.) Gahagan testified that the person in photograph number three looked "very, very much like the person" and that "I felt at that point I would have said maybe 90 percent positive." (Id. at 88.)

Everson then instructed Gahagan to circle photograph number three and to write down on the back of the photo spread why she selected that photograph:

> The reason I picked #3 is because of the eyes. The hair was longer, parted in the middle, and there was no beard – but if I look only at the face, the eyes look very much like the person I encountered. I have viewed numerous line ups and this person looks more like the correct one than any of the ones I've seen.

(Ex. 4.) At the suppression hearing, Everson explained why he had Gahagan circle Mardis's photograph:

> Q.   Did – did you, after she made this statement to you that this person looks more like any other photo that I've seen, did you [] tell her to circle the photo?
>
> A.   At that point I determined that was a tentative identification, it might not have been a positive,

> but it was a tentative, so I had her circle and
> then sign and date it and then write, why she chose
> that individual, on the back.

(Tr. at 266.)   Gahagan testified as follows about her

identification:

> Q.   So then based on the procedures that have been
> outlined, you were able to positively identify
> number three?
>
> A.   I identified him as being very much like the
> person.  I did not put that he was exactly the
> person. . . .
>
> Q.   I just want to know how we got to that point, I'm
> not saying that you were wrong for doing it –
>
> A.   Because I wanted to be exactly certain.  This
> picture is not a good picture.  It's blurry.  When
> I saw the picture, the eyes, it looked very, very
> much like the person, but for me to say one hundred
> percent, I was not comfortable doing that at this
> point until I could see someone in person.  I would
> not dare do that, and that's why I wrote this.

(Id. at 74.)  After Mardis was arrested and appeared in state court

in September of 2004, Gahagan was present in court and after seeing

Mardis in person for the first time, she was positive that Mardis

was the driver:

> Q.   And as you stood there that day, you were confident
> you had not seen him any other time prior to that
> except for what you believed to be on the 17th of
> April, 2001 –
>
> A.   That's correct.
>
> Q.   For that one minute – one to two-minute period of
> time, ever how long it was –
>
> A.   That's correct.
>
> Q.   – when you had that conversation?

-10-

A.    That's correct.

Q.    Okay.   And at that initial meeting where you
      believed you saw Mr. Mardis, you weren't always
      looking at Mr. Mardis, were you?

A.    Most of the time, I was.   I did glance over, you
      know, like I said, what was beside him, but I was
      so close to him, and it's – I know that I know that
      I know that that was him.   It was – first of all, I
      was very cautious about who – I was going up to a
      vehicle and sticking my head in and talking to, so
      I was apprehensive about the person to begin with.
      Then when I actually saw what I thought was a body,
      I was very – you know, looking again at his face,
      looking at him, because there was some heightened –
      you know, I think some apprehension, which I think
      heightens your senses, and I'm sitting there, and
      then two days later, knowing that this person could
      have committed a murder, I'm sorry that I etched
      his face in my brain.   I would have known him
      anywhere, I'm sorry, yes.

(Id. at 83-84.)

## C.    Credibility of Gahagan's Testimony

Gahagan testified at the suppression hearing that, prior to
identifying Mardis's photograph in the photo spread on July 7,
2004, she was shown "hundreds" of photographs of individuals, and
that she did not recall ever being shown a photograph of Mardis and
never identified any other photographs as depicting the driver.
(Id. at 50-54.)   Mardis challenges the credibility of this
testimony.   First, Mardis contends that it is simply unbelievable
that the investigators did not show Mardis's photograph to Gahagan
prior to 2004, as Mardis was identified as a "person of interest"
early in the investigation.   (Id. at 118-19.)   Wright was last seen

-11-

at a location directly connected to Mardis, Mardis's physical appearance at the time was consistent with the description of the driver provided by Gahagan, and when Mardis was questioned by Mayes about Wright's disappearance, Mardis became uncooperative. Moreover, Mayes testified at the suppression hearing that during the investigation, Paris told him that he (Paris) had shown Gahagan a photo spread that included Mardis's photograph. (Id. at 196-97, 205-06.)

Second, Mardis contends that Gahagan was, in fact, previously shown either a photograph of someone other than Mardis or another photo spread that did not include Mardis's photograph, and she identified someone else as the driver. In support of this, Mardis points to Paris's testimony during a hearing in Mardis's state court case and at the suppression hearing, in which Paris testified that it was his "understanding" that Gahagan had misidentified someone else, and as a result of that information, he interviewed a person who was eventually determined to be not involved in Wright's disappearance. (Id. at 121-22, 128, 138.)

With respect to both aspects of Gahagan's testimony, the court finds her testimony to be credible. Regarding whether Gahagan was ever shown a photograph of Mardis or a photo spread that included Mardis prior to July 7, 2004, Paris testified that he did not do that and never asked anyone else to do it. (Id. at 135-36.) Likewise, Mayes testified that he never showed Gahagan a photograph

-12-

of Mardis or a photo spread that included Mardis. (Id. at 173-75, 178, 206-07.) When Everson took over the investigation in 2004, he found only one photo spread in the file, and that spread did not include Mardis's photograph. Although Mayes testified that Paris, at some point during the investigation, said that he showed Gahagan a photo spread that included Mardis, Mayes further testified that he did not believe Paris was being forthright with him at the time and thought Paris told him that just to "play him off," because Paris was busy with other cases. (Id. at 179, 204-07.) While in hindsight it would have made sense for the investigators to show Gahagan a photo spread with Mardis's photograph well before 2004, the fact remains that it simply was not done.

Regarding whether Gahagan misidentified someone else as the driver, to the extent Gahagan's and Paris's versions of the events conflict, the court credits the testimony of Gahagan over the testimony of Paris. As initial matter, the court notes that during the suppression hearing, Paris did not appear to have a strong recollection of the events surrounding the investigation. He did not recall who he had received this information from, he was not present when Gahagan supposedly misidentified this other individual, and no report exists that would suggest this alleged misidentification ever happened. (Id. at 123-24, 140-44.) When Everson took over the case, the investigation file contained only one photo spread, and Gahagan never identified any of those

individuals as the driver.

In sum, the court finds that there is no reliable evidence that Gahagan was shown a photograph of Mardis or a photo spread that included Mardis's photograph prior to July 7, 2004, or that Gahagan identified anyone other than Mardis as the driver.

## D.  Interrogation of Dale and Patsy Mardis

During the early morning hours of July 14, 2004, police officers arrested Mardis at his residence and transported him to the Criminal Justice Complex ("CJC").  Although Mardis's wife, Patsy Mardis, was not under arrest, she went to the CJC to be with her husband.  Dale Mardis was placed in a conference room and questioned by Everson and FBI Special Agent C. M. Sturgess.  The officers advised Mardis of his <u>Miranda</u> rights, and after approximately thirty minutes of questioning, the "questioning got a little heated," at which point Mardis invoked his right to counsel.  (<u>Id.</u> at 271.)  Everson stopped all questioning at that point and left the room.

At the same time, Mrs. Mardis was sitting in a different room at the CJC and was accompanied by Sergeant Joey Pearlman of the Memphis Police Department.  When Everson arrived, he asked Sergeant Pearlman whether she had made any statements, to which he responded that she had not.  Sergeant Pearlman then left the room, at which time Everson along with FBI Special Agent Justin Smith started talking to Mrs. Mardis.  Over the next twenty or thirty minutes,

-14-

Mrs. Mardis repeatedly asked if she could see her husband or have him join her in the room, to which Everson responded that he would not allow that to happen. (Id. at 273.)

Mrs. Mardis then told Everson that she would agree to give a statement if Everson would tape record her statement and play it for her husband. Everson agreed to that approach and even suggested that the recorded statement be played while the Mardises were in the same room:

> A.  When she kept asking to have Mr. Mardis present, you know, I kept denying and saying no, that – that's not going to happen, you need to tell us what you know. And then she brought up the – the idea of, well, if we can't be in here, would you record this statement and play it for him. I said, you know, that sounds like a good idea, we'll do that.
>
> Q.  Okay.  Why did you – why did you agree to that?
>
> A.  Well, because I – I wanted to get her statement and that was a condition that she threw out for me to get, you know, take a statement from her. I will give you a statement if you record it and play it for my husband.
>
> Q.  And who brought up the – the entire subject of recording it and playing it for my husband?
>
> A.  She did, Ms. Mardis.
>
> Q.  Okay.
>
> A.  And, of course, that sounded like a great idea to me, you know, so the idea that we weren't going to [d]o it unless she requested it. And, you know, when she requested it, it sounded like [a] good idea.
>
> Q.  So did you record a statement from her?

-15-

> A.   *I did record a statement from her.  And I even told*
> *her that I would play her statement for Mr. Mardis*
> *with her sitting there.*
>
> Q.   And did she request that?
>
> A.   Absolutely.
>
> Q.   All right.  Now, let me ask you this, did you make
> that suggestion with any – with any other motive in
> mind other than to take Ms. – to get Ms. Mardis to
> give you some evidence?
>
> A.   No, that is the condition that she gave me, I will
> give you a statement if you will record it and play
> it for my husband.

(Id. at 274-76) (emphasis added.)

At approximately 3:50 a.m., Everson advised Mrs. Mardis of her
Miranda rights, and she waived her rights by signing a rights
waiver form.  After executing the waiver, she gave a tape recorded
statement.[3]   (Ex. 7.)   As the recording began, Everson again
advised Mardis of her Miranda rights, and she confirmed that she
had previously waived her rights.   Everson stated that the police
had reason to believe that she had information regarding Wright's
disappearance.   She responded that on April 17, 2001, she received
a phone call from her husband in the early afternoon.   He asked her
to meet him at a location on Goodman Road in Mississippi.   She left
work and proceeded to drive in the direction of Goodman Road, but
apparently because she was not sure of the meeting location, she

---

[3]At some point before Everson began recording Mrs. Mardis's
statement, she told Everson that her husband told her that he shot
Wright because Wright pulled a gun on him.

went to the A Car Lot.  Her husband was not at the car lot, and she did not see her husband until around 6:00 p.m. that evening.

Everson then asked if she had a conversation with her husband about Wright's disappearance.  She responded, "At a much later date . . . I'm sorry darling."[4]  She said that he told her "[t]he code person who came by that day was real nasty, real ugly, using cuss words and stuff.  He didn't tell me the details.  He said the guy pulled a gun on him, and saying all these ugly things to him, and threatened his life."  She continued, "It sounds like he protected himself. . . . by maybe, shot him."  Everson asked, "Did he tell you that?"  She responded "Yes."  Everson then asked, "So you're telling me that your husband, Dale Mardis, told you that he had a confrontation with Mickey Wright on 4/17/01 and in self-defense he shot and killed Mickey Wright?"  She responded, "He told me he shot him, so I guess that's what that means."  She said Mardis told her this several months after April 17, 2001.  She continued, "My husband would not hurt anybody unless he felt like his life was threatened.  He would not harm a soul."  She concluded by saying, "I feel like a traitor."  The recording ended at 4:19 a.m.

After Everson finished questioning Mrs. Mardis, Dale Mardis (who was still in handcuffs) and Mrs. Mardis were placed in a room together.  With six to eight officers in the room, Everson played

---

[4]Mrs. Mardis's comment "I'm sorry darling" was directed at her husband, not Everson.

-17-

the tape recorded statement while the Mardises sat next to each other and held hands.  (Tr. at 327.)  While the tape played, Mrs. Mardis apologized to her husband for "betraying" him.  At the end of the tape, Dale Mardis looked at his wife and said, "It's okay. You did the right thing.  You told the truth."  (Id. at 316.)

At the suppression hearing, Everson was questioned about how he obtained Mrs. Mardis's statement and why he decided to play the tape for Mardis:

> Q.    All right.  So it's your testimony that Ms. Mardis asked you then to play the statement to – to Mr. Mardis and for her to give you a statement?
>
> A.    That's correct.
>
> Q.    All right.  Prior to that she had already told you what she was going to tell you though, didn't she?
>
> A.    It came about in that conversation and that's why I'm sure that's when I advised her of her rights what's she was going to tell me, and she told me that the only way she would give me a statement is if I recorded it and played it for him.
>
> Q.    My question is, though, that prior to starting the recording during that hour to two hour, hour and 45 minute long conversation she told you the facts that she eventually put on the recorder?
>
> A.    I believe that's a fair statement, yes, sir.
>
> Q.    There wasn't any surprises on the recorder that she hasn't already told you?
>
> A.    No.
>
> Q.    Okay.  So you knew when you agreed to record that statement and to play it for Mr. Mardis that it had statements that were incriminating to Mr. Mardis?
>
> A.    Yes.

-18-

Q.    That – that for lack of a better term essentially
      incriminated him into the death of Mickey Wright?

A.    Yes.

Q.    Okay.  So based on that knowledge you agreed to
      record that statement to play for Mr. Mardis?

A.    Yes.

Q.    Okay.  So you had your confession, for lack of a
      better, you had someone to implicate your suspect
      in the crime?

A.    I did not know how much detail she would go into on
      tape, so I didn't know if she was going to tell me
      the exact same thing again or allude to more
      information, but, like I said, we only turned the
      tape recorder on because she requested it and that
      was the only way to go for her to end up giving us
      a statement.

Q.    I asked you a few minutes ago if there were any
      surprises when you recorded it and you said no.

A.    Right.

Q.    I'm assuming that when you spoke with her she told
      you that Mr. Wright was cussing and threatened to
      pull a gun on Mr. Mardis and then Mr. Mardis shot
      him –

A.    Yes.

Q.    – and that's basically what she told you?

A.    That's what she reiterated to us.

Q.    Right, she told you that prior to the recording?

A.    Yes.

Q.    So you had from her information that you desired
      that corroborated your investigative instincts that
      this was your suspect?

A.    Yes.

Q.   And that now you could close the file, you had done
     your job?

A.   I don't think that was going to be the end of it,
     but it gave us more evidence.

Q.   And the only thing better than that would be to get
     a confession?

A.   Yes.

Q.   And that – that's what you were going for, right?

A.   I mean, that's what everybody would go for.

Q.   That's why you questioned Mr. Mardis in the very
     beginning you were trying to get a confession out
     of him?

A.   Absolutely.

Q.   And you knew the minute he said I invoke my right
     to counsel you weren't getting a confession from
     him?

A.   Absolutely.

Q.   Because you couldn't ask him any more questions?

A.   No.

Q.   Now in your many years of experience as an
     investigator one of the tools that you used is to
     show somebody a statement that somebody else has
     made that implicates them in a crime?

A.   Yes.

Q.   Very common?

A.   Absolutely.

Q.   Would you say that is probably the most common way
     that you get people to confess to a crime is to
     show them that other people are, quote, ratting
     them out?

A.   Yes.

-20-

Q.    Okay.  While it's true that Ms. Mardis asked you to
      play that tape for Mr. Mardis, you knew based on
      your experience that potentially this was going to
      bring out a confession?

A.    Potentially, yes.

Q.    And that in part motivated you to agree to do it?

A.    I'm not saying I didn't want to do it from the very
      beginning.  I'll just say she suggested it and I
      certainly agreed with it.

      . . . .

Q.    That's what you would do, you would get a recorded
      statement and play it for the suspect in hopes that
      they would come clean?

A.    Yes.

Q.    Okay.  And that was part of what motivated you here
      . . . ?

A.    Yes.
      . . . .

Q.    Now you had six or eight other officers there,
      correct?

A.    Yes.

Q.    You acknowledged that Mr. Mardis wasn't going
      anywhere?

A.    Yes.

Q.    Okay.  So what was the need for the six or eight
      other officers?

A.    Well, three or four of them were assigned to our
      unit.  The other three or four were on duty with
      the sheriff's office at the time, they weren't part
      of our unit, they were just in the office.

Q.    But they were listening?

A.    Oh, this was a big deal.

-21-

Q.   Absolutely because you were going to hopefully get
     a confession out of Mr. Mardis? Right? You nodded
     your head.

A.   Right, I wanted a confession out of him.

(Id. at 303-08, 327-28.)

On redirect examination, the government attempted to clarify

Everson's motivation in deciding to play the tape for Mardis:

Q.   The question is, was that why you played the tape?

A.   I played the tape to get a statement from Mrs.
     Mardis.

Q.   And were you trying to interrogate Mr. Mardis by
     playing the tape?

A.   No, sir, I was just waiting to see what he had to
     say.

Q.   And [defense counsel] was asking you about
     [whether] it's common for you to get somebody's
     statement and go in and read it to somebody else,
     is that correct?

A.   That is correct.

Q.   That's a common interrogation?

A.   Yes, sir.

Q.   How often do you do that after one of the persons
     invoke their Sixth Amendment rights?

A.   Generally we don't after they invoke because we
     can't ask them anything unless they initiate the
     contact.

Q.   So if [defense counsel] said anything to make this
     sound like that was policy and how you all worked
     at the sheriff's department, is that true or false?

A.   No, we can't ask them any other question after they
     invoke.  It doesn't matter if I want to go take 15

-22-

statements into him, I can't ask him anything else.

Q.   And have you ever, after somebody has invoked, go back in, well, look I know you invoked, but let me tell what you the proof is; have you ever done that?

A.   Not as – maybe to rub it in their face, na-nan-nan-nan, you know, we got a statement on you, but not to get any more response from him because we can't use it.

Q.   Okay.  So have you ever done this where somebody asked you to record a statement and play it for somebody else again?  Any other – have you ever had this happen before?

A.   Not to my knowledge.

Q.   Do you have any basis in fact that Mr. Mardis would say anything?

A.   No.   I sure wanted to, but, no, I didn't have anything that he would.

Q.   That was not what you were intending to do?

A.   No.

Q.   You were just doing this, if I'm correct, to get Mr. Mardis – Ms. Mardis' statement?

A.   That's exactly right.

Q.   And to standby your word is what you said?

A.   Absolutely.

(Id. at 328-30.)

After Everson finished playing the recorded statement, he asked Dale Mardis where they could find Wright's body, so that Wright's family could give him a proper burial and have some closure.   (D.E. 200 at 2.)   Everson told Mardis that any

-23-

information he provided could not be used against him because he had invoked his right to counsel. (Id. at 333-34.) In response to Everson's question, Mardis stated, "I can't help you . . . there's nothing left." (D.E. 200 at 2.)

## II. PROPOSED CONCLUSIONS OF LAW

### A. Motion to Suppress Evidence of Prior Identification and Preclude Future In-Court Identifications

Mardis moves to suppress the evidence of Gahagan's identification of his photograph in the photo spread shown to her on July 7, 2004, and to preclude any and all future in-court identifications because, he argues, the identification procedure was impermissibly suggestive. "Due process 'prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification.'" United States v. Crozier, 259 F.3d 503, 510 (6th Cir. 2001) (quoting Carter v. Bell, 218 F.3d 581, 605 (6th Cir. 2000)). "An identification is admissible if reliable, even if obtained through suggestive means." Id.

In the Sixth Circuit, courts follow a two-step analysis to determine whether an identification is admissible. Id. (citing Ledbetter v. Edwards, 35 F.3d 1062, 1070 (6th Cir. 1994)). First, the court considers whether the identification procedure was "unduly suggestive." Ledbetter, 35 F.3d at 1071 (citing Thigpen v. Cory, 804 F.2d 893, 895 (6th Cir. 1986)); see also Tipton v. Carlton, 306 F. App'x 213, 218 (6th Cir. 2008); United States v.

-24-

Irorere, 69 F. App'x 231, 235 (6th Cir. 2003).  "The defendant bears the burden of proving this element." Ledbetter, 35 F.3d at 1071.

If the court finds that the procedure was unduly suggestive, "it next evaluates the totality of the circumstances to determine whether the identification was nevertheless reliable." Id.  The five factors that the court weighs in determining reliability are: (1) the opportunity of the witness to view the perpetrator during the crime; (2) the witness's degree of attention to the perpetrator; (3) the accuracy of the witness's prior descriptions of the perpetrator; (4) the level of certainty demonstrated by the witness when identifying the suspect; and (5) the length of time between the crime and the identification. Crozier, 259 F.3d at 510 (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).  "'Against these factors is to be weighed the corrupting effect of the suggestive identification itself.'" Id. (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)).

The July 7 photo spread identification procedure was not unduly suggestive.  The court notes that Mardis does not contend that the photo spread itself was in any way suggestive, such as the manner in which the photographs were positioned or the selection of photographs that were included in the spread.  Instead, he asserts that Everson should not have told Gahagan to circle photograph number 3 (Mardis's photograph) and to write down her explanation

for selecting that photograph because Gahagan was not "100% positive" the person in that photograph was the driver.

It is unclear to the court why, as Mardis argues, Gahagan's inability to make a "100% positive" identification renders the procedure unduly suggestive, as the degree of uncertainty surrounding her identification goes to the reliability analysis. In any event, "[t]here is no per se rule excluding an in-court identification where the witness failed to make an unqualified and emphatic identification during a pretrial line-up." Steadham v. Pliler, No. C 00-3991, 2002 WL 1766588, at *10 (N.D. Cal. July 29, 2002) (concluding that defendant's due process rights were not violated by admission of in-court identifications where witnesses had expressed uncertainty during pre-trial line-ups and testified that on a scale of one to ten, he rated the certainty of his in-court identification as "five"); see also United States v. McComb, 249 F. App'x 429, 441 (6th Cir. 2007) (stating that witness pretrial identification which was "90 percent sure" was reliable); Sims v. Sullivan, 867 F.2d 142, 145 (2d Cir. 1989) (holding that where photographic identification was less than "one hundred percent positive," that degree of uncertainty was insufficient to warrant disregarding the identification).

Moreover, Gahagan testified that when she saw Mardis's photograph, she was "maybe 90 percent positive" that he was the driver. She also testified that "when I saw the picture, the eyes,

it looked very, very much like the person, but for me to say one hundred percent, I was not comfortable doing that at this point until I could see someone in person." When Gahagan later saw Mardis in person when he appeared in state court, she was positive that Mardis was the driver. As for Everson's instruction to Gahagan to write down her explanation as to why she selected photograph number 3, there was nothing unduly suggestive about what he did, and in fact, by doing so Everson properly and accurately documented the identification process.

Although not entirely clear from the motion, it also appears that Mardis claims that the circumstances surrounding Gahagan's July 7 identification were unduly suggestive because Gahagan was shown a photograph of Mardis sometime earlier in the investigation, and that perhaps the July 7 identification was tainted because she had previously seen Mardis's photograph. As discussed above, the court finds that Gahagan had not been previously shown any photographs of Mardis, and thus Mardis's argument lacks merit. In addition, even if Gahagan had in fact previously seen a photograph of Mardis, she has no recollection of having seen his photograph and there is no indication that this alleged prior event had any affect on her July 7 identification.

After considering the evidence presented at the suppression hearing, the court finds that Mardis has not met his burden of proving that the identification procedure was unduly suggestive.

-27-

Therefore, the court need not address the reliability prong of the inquiry.  See United States v. Hill, 967 F.2d 226, 232 (6th Cir. 1992) (stating that "[o]nly if the defendant meets the initial burden of proof must the court then go on to determine whether the identification was reliable given the totality of the circumstances"); United States v. Johnson, 282 F. Supp. 2d 808, 812 (W.D. Tenn. 2003) (explaining that because defendant did not meet his burden of proving that the identification procedures were unduly suggestive, the court did not need to address the reliability prong).  However, even assuming, arguendo, that the procedure was somehow unduly suggestive, the court nevertheless finds that under the totality of the circumstances, Gahagan's identification was reliable.  Gahagan met face-to-face with the driver and engaged in a one-on-one conversation with him for one or two minutes; her level of attention was very high based on her concern that the driver had been parked near the daycare for a long time and based on her seeing what she thought was a body covered by a sheet; her prior descriptions of the driver were detailed, accurate, and consistent; and she exhibited a high level of certainty in her identification of Mardis's photograph.  Although the July 7 identification was not made until over three years after she had her encounter with the driver, she testified that she "etched [the driver's] face in [her] brain" and that she "would have known him anywhere."  Finally, as discussed above, Gahagan had

not identified anyone else as the driver prior to her July 7 identification.

Therefore, the court recommends that Mardis's Motion to Suppress Evidence of Prior Identifications and Preclude Future In-Court Identifications be denied.

**B.   Motion to Suppress Adoption of Defendant's Wife's Statement**

In his Motion to Suppress Adoption of Defendant's Wife's Statement, Mardis argues that his adoptive admission, "It's okay. You did the right thing.  You told the truth," should be suppressed because he had invoked his right to counsel before Everson played Mrs. Mardis's taped statement, and that by playing the taped statement in front of Mardis, Everson engaged in the "functional equivalent" of police interrogation in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  The court agrees.

In Miranda, the Supreme Court held that before beginning custodial interrogation, the police must advise suspects of their Fifth Amendment right to remain silent and right to the presence of an attorney.  Id. at 479.  With respect to the right to counsel, the Court stated:

> Once warnings have been given, the subsequent procedure is clear. . . .  If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.  At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.  If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

Id. at 473-74; see also Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (stating that once a suspect invokes the right to counsel, the suspect "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police"). In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court defined "interrogation" for purposes of determining whether an individual's right to counsel has been violated under Miranda:

> We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

Id. at 300-02 (emphasis in original). The Court noted that in determining whether police conduct is the functional equivalent of interrogation, the intent of the police may be relevant to the

-30-

determination, "for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." Id. at 301 n.7.

Here, it is undisputed that Mardis was informed of his Miranda rights by Everson, he invoked his right to counsel, and he was "in custody" when Everson played Mrs. Mardis's recorded statement for Mardis. The issue, then, is whether Mardis was "interrogated" by police in violation of his right under Miranda to remain silent until he had consulted with a lawyer.

A case of particular significance to the issue before the court is the Supreme Court's decision in Arizona v. Mauro, 481 U.S. 520 (1987), which the government contends is "directly on point" with the present case. (D.E. 158 at 4.) In Mauro, the defendant, William Mauro, walked into a K-Mart store and claimed that he had killed his son. When officers arrived, Mauro freely admitted that he had killed his son and directed the officers to the location of his son's body. Mauro was arrested and advised of his Miranda rights. Officers then took Mauro to the police station, where he was again advised of his Miranda rights. He told the officers that he did not wish to make any more statements without having a lawyer present. The officers ceased all questioning at that point. 481 U.S. at 521-22.

At the same time, a detective was questioning Mauro's wife in

-31-

another room.  Mrs. Mauro requested to speak with her husband.  The
detective was reluctant to allow it at first, but after she
insisted, the detective agreed to let them talk.  The detective
told Mauro and his wife that they could speak together only if an
officer was present in the room to observe and tape record their
conversation.  Mauro and his wife were then placed in a room
together with the detective.  The Mauros had a brief conversation,
which was recorded with a tape recorder placed on a desk in plain
sight, and during the conversation Mauro made certain statements
directed at Mrs. Mauro which were incriminating in nature.  At
Mauro's trial, the trial court allowed the government to use the
tape recorded statement as evidence to rebut Mauro's insanity
defense, over Mauro's objection.  The Arizona Supreme Court
reversed, finding that by allowing Mauro to speak with his wife in
the presence of the officers, the police interrogated Mauro within
the meaning of Miranda.  The court, relying on Innis, found that
the officers' testimony demonstrated that there had been
interrogation because "[t]hey both knew that if the conversation
took place, incriminating statements were likely to be made."  Id.
at 524.

The Supreme Court, however, found that the Arizona Supreme
Court misconstrued the Innis decision and reversed:

> There is no evidence that the officers sent Mrs.
> Mauro in to see her husband for the purpose of eliciting
> incriminating statements.  As the trial court found, the
> officers tried to discourage her from talking to her

husband, but finally "yielded to her insistent demands." Nor was Detective Manson's presence improper.   His testimony, that the trial court found credible, indicated a number of legitimate reasons – not related to securing incriminating statements – for having a police officer present.   Finally, the weakness of Mauro's claim that he was interrogated is underscored by examining the situation from his perspective.   We doubt that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way.

The Arizona Supreme Court was correct to note that there was a "possibility" that Mauro would incriminate himself while talking to his wife.   It also emphasized that the officers were aware of that possibility when they agreed to allow the Mauros to talk to each other. But the actions in this case were far less questionable than the "subtle compulsion" that we held *not* to be interrogation in <u>Innis</u>.   Officers do not interrogate a suspect simply by hoping that he will incriminate himself. . . .

. . . .

In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in <u>Miranda</u> and <u>Edwards</u>: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment.   The government actions in this case do not implicate this purpose in any way.   Police departments need not adopt inflexible rules barring suspects from speaking with their spouses, nor must they ignore legitimate security concerns by allowing spouses to meet in private.   In short, the officers in this case acted reasonably and lawfully by allowing Mrs. Mauro to speak with her husband.   In this situation, the Federal Constitution does not forbid use of Mauro's subsequent statements at his criminal trial.

<u>Id.</u> at 528-30 (internal citations and footnote omitted) (emphasis in original).

While in <u>Mauro</u> the Court found "no evidence that the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting

-33-

incriminating statements," <u>id.</u> at 528, in the present case there is compelling evidence that Everson should have known that playing Mrs. Mardis's recorded statement for Mardis would reasonably likely elicit an incriminating response.  Unlike in <u>Mauro</u> where the detective had no idea what Mrs. Mauro might say to her husband once they were placed in the same room, Everson knew *before* he played the recorded statement for Mardis *exactly* what Mardis was going to hear, specifically, that his wife told the police about Mardis's role in Wright's disappearance and that she felt like a "traitor" to her husband.  Thus, while the detective in <u>Mauro</u> at most only recognized the "possibility" that Mauro would incriminate himself while talking to his wife, in the present case it was much more than just a possibility – it was, at the very least, reasonably likely that Mardis would make an incriminating statement when confronted with his wife's statement.

In fact, Everson testified that confronting a suspect with a statement made by someone else that implicates the suspect in criminal conduct is an interrogation technique he routinely employs for the purpose of obtaining a confession from the suspect and that it is "the most common way" to get a confession.  (Tr. at 328-30.)  As the Supreme Court explained in <u>Innis</u>, "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation."  446 U.S. at 301.

-34-

The government asserts that Everson did not play the recorded statement for Mardis with the intention of eliciting an incriminating statement.  Instead, the government argues that the reason Everson played the recorded statement was because Everson promised Mrs. Mardis that he would do so in exchange for her statement, and that he was simply living up to his end of the bargain.  The court finds this argument unpersuasive.  Although it was Mrs. Mardis's idea to record her statement and play it for her husband, according to Everson's testimony, he was the one who proposed that the statement be played with Mrs. Mardis in the room with her husband.  This certainly suggests that Everson may have thought that his chances of obtaining a confession from Mardis would be greater if Mardis heard the recorded statement with his wife in the room.[5]  Moreover, while Everson testified that he played the statement to Mardis to fulfill his promise to Mrs. Mardis, he also admitted that he played the recorded statement "to see what [Mardis] had to say" and that he "wanted a confession out of [Mardis]."

While "[o]fficers do not interrogate a suspect simply by

---

[5]The court notes that even if it was Mrs. Mardis's idea to be in the room with her husband as Everson played the tape, this would not alter the court's analysis.  The determination of whether Mardis's <u>Miranda</u> rights were violated does not turn on whether the police or Mrs. Mardis suggested the idea, as the police cannot employ a procedure that violates a suspect's <u>Miranda</u> rights and then justify the violation by arguing that somebody else came up with the idea.

hoping that he will incriminate himself," in this case Mardis was subjected to compelling influences and a psychological ploy intended by the police to elicit an incriminating response.  <u>See</u> <u>Mauro</u>, 481 U.S. at 529.  He was handcuffed and placed in a room with Everson and six to eight other officers, his wife was brought into the room and seated next to him, and he had to listen to his wife implicate him in Wright's murder in front of the officers.[6] "[C]onfronting a suspect with his alleged partner in crime and the fact that the partner has confessed is precisely the kind of psychological ploy that <u>Innis</u>'s definition of interrogation was designed to prohibit." <u>Nelson v. Fulcomer</u>, 911 F.2d 928, 935 (3d Cir. 1990), <u>superseded by statute</u>, Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, <u>as</u> <u>recognized in</u> <u>Berryman v. Morton</u>, 100 F.3d 1089 (3d Cir. 1996).

In sum, Mardis was subjected to the functional equivalent of interrogation after he invoked his right to counsel.  Because his statement was obtained as a direct result of custodial interrogation in violation of <u>Miranda</u> and <u>Edwards</u>, the court recommends that Mardis's Motion to Suppress Adoption of Defendant's Wife's Statement as His Own Admission be granted.

**C.   Motion to Suppress Evidence of Marital Communications**

---

[6]Another important distinction between the present case and <u>Mauro</u> is that, whereas in <u>Mauro</u> there was only one detective who stayed in the room with the Mauros for security reasons, Everson and six to eight additional officers were in the room when the recorded statement was played for Mardis.

Mardis also moves to preclude the government from using at trial Mrs. Mardis's recorded statement, on the grounds that the statement reveals conversations that are covered by the marital communications privilege.   Privileges under federal law are governed by the common law as interpreted by case law.   Fed. R. Evid. 501.   "Federal law recognizes two distinct privileges with regard to spouses: (1) The adverse testimony privilege by which one spouse cannot be forced to testify against the other in a criminal proceeding and (2) the confidential communications privilege, which protects confidential communications between spouses made in confidence during the marriage." United States v. Irons, 646 F. Supp. 2d 927, 952 (E.D. Tenn. 2009) (citing United States v. Porter, 986 F.2d 1014, 1018 (6th Cir. 1993)).   "Only the testifying spouse can assert the adverse testimony privilege, whereas the marital communications privilege can be asserted by either spouse."[7] Id.

"[T]he person asserting the marital privilege has the burden of proving that a communication is a marital communication." Morganroth & Morganroth v. DeLorean, 123 F.3d 374, 383 (6th Cir. 1997).   In order for the marital communications privilege to apply, three conditions must exist: "(1) At the time of the communication there must have been a marriage recognized as valid by state law;

---

[7]To the extent Mardis also seeks to preclude the government from calling Mrs. Mardis to testify at trial about her conversation with him, Mrs. Mardis is the only person who can assert that privilege.

(2) the privilege applies only to 'utterances or expressions intended by one spouse to convey a message to the other'; and (3) the communication must be made in confidence." <u>Porter</u>, 986 F.2d at 1018 (internal citations omitted). The court finds that Mardis has satisfied all three prerequisites of the marital communications privilege. It is undisputed that at the time of the communications at issue, the Mardises were legally married (and are presently still married), the communications reflect intentions by the Mardises to convey information to each other, and the communications were made in confidence.

The government does not dispute that Mrs. Mardis's conversations with her husband regarding Wright's murder are privileged under the marital communications privilege.[8] (D.E. 173 at 5-6.) The government argues, however, that after Mardis heard Mrs. Mardis's recorded statement and stated, "You told the truth," he adopted her statement as his own. Therefore, by adopting this statement in the presence of the police, he disclosed the communications and waived the privilege.

---

[8]The government argues that "[t]o the extent that Patsy Mardis related information other than conversations between her husband and herself, however, such as her location on the day of Wright's disappearance, that information is not covered by the marital privilege." (D.E. 173 at 6 n.1.) The court agrees that Mrs. Mardis's statement relating to her location on April 17, 2001, by itself, is not protected by the marital communications privilege. <u>See</u> <u>Irons</u>, 646 F. Supp. 2d at 957 (explaining that the privilege "must be construed narrowly" and citing cases for the proposition that testimony about spouse's actions and appearance is not privileged).

The government has not cited, and the court in conducting its own research has not found, any cases that support the government's novel contention that an "adopted admission" made in the presence of third parties can constitute a waiver of the marital communications privilege. In any event, the court has found that Mardis's statement was obtained in violation of <u>Miranda</u> and <u>Edwards</u>, and thus the government cannot base the purported waiver of the privilege on the illegally obtained statement. Moreover, given the circumstances under which Mardis made the statement, the purported waiver was not made voluntarily and therefore the presence-of-a-third-party exception is inapplicable. <u>See</u> <u>United States v. Gen. Mar. Mgmt. (Port.) L.D.A.</u>, No. C-08-393, 2008 WL 2810594, at *3 (S.D. Tex. July 21, 2008) (stating that the spousal communications privilege was waived when husband voluntarily provided his computer to the government); <u>United States v. Neal</u>, 532 F. Supp. 942, 947 (D. Colo. 1982) (stating that presence-of-a-third-party exception was inapplicable because "rationale behind this exception is that a spouse's willingness to speak to the other spouse, knowing that a third party is present, indicates an intent that the communication not be confidential"). Therefore, the court recommends that the Motion to Suppress Evidence of Marital Communications be granted.

**D.   Supplemental Motion to Suppress Statements**

In Mardis's Supplemental Motion to Suppress Statements, Mardis

-39-

seeks to suppress post-arrest statements he made to Everson in response to questions about the location of Wright's body. Specifically, after Mardis was arrested, advised of his <u>Miranda</u> rights, and invoked his right to counsel, Everson asked Mardis where they could find Wright's body, so that Wright's family could give him a proper burial and have some closure. Everson told Mardis that any information he provided could not be used against him because he had invoked his right to counsel. In response to Everson's question, Mardis stated, "I can't help you . . . there's nothing left." At the suppression hearing, the government conceded that those statements were obtained in violation of <u>Miranda</u> and agreed that it could not use the statements in its case-in-chief at trial. Based on this representation, Mardis stated to the court at the hearing that the motion is now moot. Therefore, the court recommends that the motion be denied as moot.

### III.   RECOMMENDATION

For the reasons above, the court recommends that the Motion to Suppress Evidence of Prior Identifications and Preclude Future In-Court Identifications be denied, the Motion to Suppress Adoption of Defendant's Wife's Statement and Motion to Suppress Evidence of Marital Communications be granted, and the Supplemental Motion to Suppress Statements be denied as moot.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM

-40-

```
                              United States Magistrate Judge

                              May 26, 2010
                              Date
```

                              **NOTICE**

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).   FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**