```
IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF TENNESSEE
              WESTERN DIVISION
```

|                              |   |              |
|------------------------------|---|--------------|
| **UNITED STATES OF AMERICA,** | ) |              |
|                              | ) |              |
|    Plaintiff, | ) |              |
|                              | ) |              |
|                              | ) | No. 08-20021 |
|                              | ) |              |
| **DALE MARDIS**,             | ) |              |
|                              | ) |              |
|    Defendant. | ) |              |

**ORDER REGARDING MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATIONAND OBJECTIONS THERETO**

Before the Court are several motions to suppress filed by Defendant Dale Mardis ("Defendant"): Motion to Suppress Evidence of Marital Communications (D.E. #136), Motion to Suppress Evidence of Prior Identifications and Preclude Future In-Court Identifications by Sandra Gahagan (D.E. #137), and Motion to Suppress Adoption of Wife's Statement (D.E. #138). In addition, Defendant filed an Addendum to his Motion to Suppress (D.E. #200) ("Supplemental motions"). The United States ("the Government") filed responses in opposition to each motion. The Court referred Defendant's motions to the United States Magistrate Judge for a Report and Recommendation. On May 26, 2010, the Magistrate Judge recommended that Defendant's motion to suppress evidence [of] prior identification and supplemental motions be denied; and that Defendant's motion to suppress adoption of wife's statements and wife's statements be granted. (D.E. #233) The United States ("the Government") and Defendant each filed objections to the Report and Recommendation. (D.E. #236 and #237)

For the reasons stated herein, the Court **ADOPTS in part** the Report and Recommendation of the United States Magistrate Judge.

## I.  SUMMARY OF FACTS[1]

In 2001, a federal grand jury in the Western District of Tennessee convened to investigate the disappearance of Mickey Wright ("Wright"), a Memphis and Shelby County Code Enforcement Officer. A task force comprised of federal and local law enforcement agencies was formed to investigate Wright's disappearance.  From April 2001 through August 2001, Shelby County Sheriff's Deputy James Mayes was the lead investigator, and FBI Safe Streets Task Force Officer James C. Paris assisted Mayes.  In or around August of 2001, Mayes left the task force, at which time Paris took over as lead investigator.

The Wright disappearance was further investigated by state authorities while federal prosecutors held in abeyance additional efforts to investigate potential federal charges. After its investigation, the State of Tennessee indicted Defendant for first degree murder in the death of Wright and sought the death penalty.  On April 5, 2007, in the Criminal Court of Shelby County, Defendant entered a *nolo contendere* plea to the lesser charge of second degree murder.

A subsequent federal investigation commenced under the lead of Joe T. Everson, a Shelby County Sheriff's Deputy and Special Deputy U.S. Marshal.  Assistant District Attorney General Tom Henderson, who prosecuted Defendant on the state charges, turned over his files on the Mardis case to the U.S. Attorney's Office, and Everson was assigned as a liaison to the federal investigation.

---

[1] The Court has set forth a brief synopsis of the facts, but adopts and incorporates the comprehensive facts as set forth in the Report of the United States Magistrate Judge.

Since the Court is adopting the Magistrate Judge's report, certain portions are forth herein without attribution.

Officers investigation revealed that on April 17, 2001, the day of Wright's disappearance, Sandra Gahagan ("Gahagan") had an encounter with a man in a white Memphis-Shelby County Code Enforcement truck parked outside her job in Olive Branch, MS. During the encounter, she observed something covered in a white sheet that she thought looked like a body. Gahagan later shown a photo spread by Everson wherein she identified Defendant as the man she saw in the parked truck.

On July 14, 2004, police arrested Defendant. Although Defendant's wife, Patsy Mardis ("Mrs. Mardis"), was not under arrest, she went to the Criminal Justice Complex to be with her husband. Defendant was placed in a conference room for questioning. After approximately thirty minutes of questioning, Defendant invoked his right to counsel, and questioning ceased. At the same time, Mrs. Mardis was in a different room waiting to see Defendant. Mrs. Mardis offered to give officers a recorded statement if they would agree to allow her to see her husband and would agree to play the tape for him. After waiving her Miranda Rights, Mrs. Mardis gave a taped statement wherein she disclosed that her husband told her that he shot Wright. Defendant and Mrs. Mardis were placed in a room together where Everson played the recorded statement. Defendant moves to suppress this statement.

## II. LEGAL STANDARD

"A district court judge must determine de novo any part of a magistrate judge's recommended disposition that has been properly objected to." Fed. R. Civ. P. 72(b). A review conducted de novo means that the reviewing court must reconsider the matter in its entirety, without granting any weight or consideration to the magistrate judge's recommended findings of fact and conclusions of law. De novo review does not mean, however, that the reviewing court must disagree with any of the findings of the magistrate judge. See United States v. Navarro-

Camacho, 186 F.3d 701, 709 (6th Cir. 1999). After reviewing the evidence, a court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). The district court need not review those aspects of the report and recommendation to which no objection is made. Thomas v. Arn, 47 U.S. 140 (1985). The district court should adopt the findings and proposed rulings of the magistrate judge to which no specific objection is filed. Id. at 151.

The Court will address each of these motions in turn.

## II. ANALYSIS

First, Defendant moves to suppress the photographic identification made by witness Sandra Gahagan as unreliable. Specifically, Defendant contends that Gahagan's identification in 2004 was tainted by the witness having been shown a prior photo spread containing Defendant's photograph, where she did not identify Mardis. Further, Defendant argues that because the witness could not make a 100% identification, the identification is unreliable and therefore inadmissible.

Defendant states that the record provides that Officer Paris presented Gahagan a photo spread containing Mardis' photograph and that the witness failed to identify Mardis. Defendant's argument is unpersuasive and not supported by case law.

After de novo review, the Court finds that the Magistrate Judge appropriately considered the evidence, properly analyzed it in light of current jurisprudence, and properly applied the law to the relevant facts.

There can be no serious argument that the method used by Everson was inappropriate or unduly suggestive. Asking the witness to circle the witness' identification and to make a written

statement of the underlying reason for the selection, allows the Court and the investigators, and ultimately, the finder of fact a window into the witnesses identification rationale.

Further, nothing in case law requires a 100% identification. The fact that the witness affixed a percentage, is a matter that goes to weight rather than admissibility. Defendant can explore and test the strength of the identification through cross examination.

The Court finds that Defendant's objections to the identification are not well founded and are denied. The Court adopts the Magistrate Judge's reasoning, findings of fact, and recommended legal conclusion as its own. Defendant's motion to suppress the identification is **DENIED**.

Next Defendant moves to suppress the wife's statement, and Defendant's adoption of the wife's statement. The Magistrate Judge recommends granting each of the motions.

The Government objects to the Magistrate Judge's conclusion that Defendant's response to Mrs. Mardis after hearing her taped confession "It's okay. You did the right thing. You told the truth," resulted from the functional equivalent of interrogation after Defendant invoked his right to counsel. Further, the Government objects to the Magistrate Judge's conclusion that the content of the statement reflected privileged marital communications. The Government argues that while Everson and other officers were happy to have Defendant's confession, their purpose in playing the recording of Mrs. Mardis was not a trick to prompt a spontaneous confession from Defendant. Everson testified that showing a suspect an inculpatory statement was an investigative technique that he sometimes used to elicit a confession, but in this case, it was done to uphold a bargain. Defendant contends and the Magistrate Judge found that Everson should reasonably have known that playing Mrs. Mardis' statement would prompt an incriminating response.

The prosecution may not use statements whether exculpatory or inculpatory, stemming from a defendant's custodial interrogation unless he has been afforded the procedural safeguards against self incrimination. Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

Miranda only applies if the suspect was interrogated while in custody. Interrogation under Miranda is express questioning or its functional equivalent that law enforcement officers should know is reasonably likely to elicit an incriminating response. Fields v. Howes, 617 F.3d (6th Cir. 2010). The test involves weighing several objective factors, including: (1) the nature of the police remarks, i.e., was it a lengthy harangue or an off-handed comment, how evocative were the remarks?; (2) the police awareness of the accused's mental or physical stability; and (3) the intent of the police, i.e., did they, or should they have known, that their remarks would likely elicit an incriminating answer. Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct. 1682 (1980).

During the early morning hours of July 14, 2004, police officers arrested Mardis at his residence and transported him to the Criminal Justice Complex ("CJC"). Although Mardis' wife, Mrs. Mardis, was not under arrest, nor compelled to attend, she went to the CJC to be with her husband. Mardis was placed in a conference room and questioned by Everson and FBI Special Agent C. M. Sturgess. The officers advised Mardis of his Miranda rights, and after approximately thirty minutes of questioning, the "questioning got a little heated," at which point Mardis invoked his right to counsel. (Id. at 271.) Everson stopped all questioning at that point and left the room.

At the same time, Mrs. Mardis was sitting in a different room at the CJC and was accompanied by Sergeant Joey Pearlman of the Memphis Police Department. When Everson arrived, he asked Sergeant Pearlman whether Mrs. Mardis had made any statements, to which Pearlman responded that she had not. Sergeant Pearlman then left the room, at which time

Everson along with FBI Special Agent Justin Smith started talking to Mrs. Mardis. Over the next twenty or thirty minutes, Mrs. Mardis repeatedly asked if she could see her husband or have him join her in the room, to which Everson responded that he would not allow that to happen. Id. at 273. Mrs. Mardis then told Everson that she would agree to give a statement if Everson would tape record her statement and play it for her husband. Everson agreed to that approach and further suggested that the recorded statement be played while the Mardises were in the same room. Id. Mrs. Mardis was properly advised of her Miranda rights before her initial statement and before the tape recorded statements. She waived her rights in writing and again verbally. Thereafter, Dale Mardis was brought into the room where, seated next to his wife, where they were allowed to hold hands while the taped statement was played (Tr at 327.) While the tape played, Mrs. Mardis apologized to her husband for "betraying him." At the end of the tape, Defendant looked at his wife and said "Its okay. You did the right thing. You told the truth." Id. at 316. During the playing of the tape, six to eight officers remained passively in the room.

The Magistrate Judge appropriately set out the standard under Miranda and found that the conduct of Everson amounted to the functional equivalent of interrogation. The Court adopts the analysis and conclusion in part.

In Miranda, the Supreme Court held that before beginning custodial interrogation, the police must advise suspects of their Fifth Amendment right to remain silent and right to the presence of an attorney. Id. at 479. With respect to the right to counsel, the Court stated:

> Once warnings have been given, the subsequent procedure is clear. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

7

<u>Id.</u> at 473-74; <u>see also</u> <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981) (stating that once a suspect invokes the right to counsel, the suspect "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police"). In <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980), the Supreme Court defined "interrogation" for purposes of determining whether an individual's right to counsel has been violated under <u>Miranda</u>:

> We conclude that the <u>Miranda</u> safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the <u>Miranda</u> safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

<u>Id.</u> at 300-02 (emphasis in original). The Court noted that in determining whether police conduct is the functional equivalent of interrogation, the intent of the police may be relevant to the determination, "for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." <u>Id.</u> at 301 n.7.

Comments meant to play on the sympathy or conscience of the suspect may well be considered tantamount to interrogation. <u>Brewer v. Williams</u>, 430 U.S. 387, 97 S. Ct. 1232, (police aware that the suspect was devoutly religious,… stated that it would be terrible if the

8

murder victim could not be given a "Christian burial" because her body was lost in an impending snow storm. Based on these facts, the Supreme Court held that interrogation had occurred). See also U.S. v. Thierman, 678 F.2d 1331 (9th Cir. 1982) (no interrogation when police informed suspect that they were about to question his girlfriend about her involvement in crime, even though officer testified that he "guessed" he was trying to get a response from the suspect); Cf. State v. Jones, 381 So. 2d 416 (La. 1980) (remark to person suspected of murdering his two-month-old son that "God takes care of little babies" was an off-hand remark meant to console the suspect, and was not tantamount to interrogation).

A conversation between co-defendants did not violate the Defendant's Fifth Amendment rights, where the co-defendant was not acting as a government agent, even though officials enabled the conversation by placing the two in adjoining cells. U.S. v. Alexander, 447 F.3d 1290 (10th Cir. 2006).

In Arizona v. Mauro, 481 U.S. 520, 107 S. Ct. 1931 (1987) the Supreme Court held that no interrogation occurred when police officers merely listened to and recorded a murder suspect's statements in a meeting with, and initiated by, his wife. The passive presence of police did not convert this to the functional equivalent of an interrogation as defined in Innis.

It was a significant factor that the police had not arranged the meeting as a type of psychological ploy. Id. The Court emphasized that placing a suspect with a person whom he or she is likely to converse is not so coercive as to be "functionally equivalent" to interrogation. Id. Similarly, the Court found that no violation, where two men disembarking from an airplane were separately questioned and then brought together, after having given conflicting statements, whereupon each then blurted out incriminating statements. U.S. v. Vasquez, 857 F.2d 857 (1st Cir. 1988).

The Court found that bringing together, in a non coercive setting, two suspects who, after being Mirandized, have given authorities conflicting stories is not sufficiently likely to elicit an incriminating response as to meet the legal standard of interrogation. Id. Cf. State v. Edrozo, 578 N.W. 2d 719, 725 (husband made incriminating statement to wife in squad car).

In large measure, the intent of the officers to elicit incriminating remarks is the key element in determining whether interrogation has occurred. However, the Supreme Court in Innis emphasized that the test is objective – are the police statements likely to elicit incriminating remarks and would a reasonable man be aware of this likelihood in making the statements. Innis, supra. While an objective standard of this type avoids the difficulty in evaluating the subjective intent of the police officers, a number of courts prior to Innis gave credit to the testimony of individual officers regarding their intent in making statements which preceded incriminating remarks by a suspect.

The Court finds that the intent of the officer in playing the tape is critical and agrees with the Government that the facts of this case are perfectly analogous to Arizona v. Mauro. In Mauro, the defendant, William Mauro, walked into a K-Mart store and claimed that he had killed his son. When officers arrived, Mauro freely admitted that he had killed his son and directed the officers to the location of his son's body. Mauro was arrested and advised of his Miranda rights. Officers then took Mauro to the police station, where he was again advised of his Miranda rights. He told the officers that he did not wish to make any more statements without having a lawyer present. The officers ceased all questioning at that point. 481 U.S. at 521-22.

At the same time, a detective was questioning Mauro's wife in another room. Mrs. Mauro requested to speak with her husband. The detective was reluctant to allow it at first, but after she insisted, the detective agreed to let them talk. The detective told Mauro and his wife

that they could speak together only if an officer was present in the room to observe and tape record their conversation. Mauro and his wife were then placed in a room together with the detective. The Mauros had a brief conversation, which was recorded with a tape recorder placed on a desk in plain sight, and during the conversation Mauro made certain statements directed at Mrs. Mauro which were incriminating in nature. At Mauro's trial, the trial court allowed the government to use the tape recorded statement as evidence to rebut Mauro's insanity defense, over Mauro's objection. The Arizona Supreme Court reversed, finding that by allowing Mauro to speak with his wife in the presence of the officers, the police interrogated Mauro within the meaning of Miranda. The court, relying on Innis, found that the officers' testimony demonstrated that there had been interrogation because "[t]hey both knew that if the conversation took place, incriminating statements were likely to be made." Id. at 524.

The Supreme Court, however, found that the Arizona Supreme Court misconstrued the Innis decision and reversed:

> There is no evidence that the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting incriminating statements. As the trial court found, the officers tried to discourage her from talking to her husband, but finally "yielded to her insistent demands." Nor was Detective Manson's presence improper. His testimony, that the trial court found credible, indicated a number of legitimate reasons – not related to securing incriminating statements – for having a police officer present. Finally, the weakness of Mauro's claim that he was interrogated is underscored by examining the situation from his perspective. We doubt that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way.
> 
> The Arizona Supreme Court was correct to note that there was a "possibility" that Mauro would incriminate himself while talking to his wife. It also emphasized that the officers were aware of that possibility when they agreed to allow the Mauros to talk to each other. But the actions in this case were far less questionable than the "subtle

11

>compulsion" that we held *not* to be interrogation in <u>Innis</u>. Officers do not interrogate a suspect simply by hoping that he will incriminate himself. . .
>
>. . . .
>
>In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in <u>Miranda</u> and <u>Edwards</u>: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. The government actions in this case do not implicate this purpose in any way. Police departments need not adopt inflexible rules barring suspects from speaking with their spouses, nor must they ignore legitimate security concerns by allowing spouses to meet in private. In short, the officers in this case acted reasonably and lawfully by allowing Mrs. Mauro to speak with her husband. In this situation, the Federal Constitution does not forbid use of Mauro's subsequent statements at his criminal trial.

Id. at 528-30 (internal citations and footnote omitted) (emphasis in original).

As in <u>Mauro</u>, where the Court found "no evidence that the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting incriminating statements," <u>Id.</u> at 528, there is no evidence that Everson should have known that playing Mrs. Mardis' recorded statement for Mardis would reasonably likely elicit an incriminating response. As the <u>Mauro</u> Court said, "officers do not interrogate a suspect simply by hoping he will incriminate himself." <u>Id.</u>

It was Mrs. Mardis who was insistent that the statement be recorded and played to her husband. Everson testified credibly that Mrs. Mardis initiated that idea of giving a statement in exchange for an opportunity to see her husband. It was her express condition that the statement be "taped recorded and played to her husband" in her own voice. It was Mrs. Mardis who insisted on going to the police station to be with her husband. It was Mrs. Mardis who demanded that she be permitted to see her husband. It was Mrs. Mardis who knew her husband better than anyone, and she, most of all, knew the stakes and how he most likely would respond. Finally, it

12

was Mrs. Mardis who uttered the incriminating statement, without provocation, to which Defendant responded.

There can be no doubt that prior to playing the tape, Everson knew the sum and substance of Mrs. Mardis' statement, but Everson could not reasonably have known that Defendant would respond by making an incriminating statement. The most Everson could do was "hope." While Everson recognized that upon being confronted with his wife's statement, one possibility was that Defendant could make an incriminating statement, it was equally possible that Defendant might have comforted his wife through a myriad of non incriminating statements or conduct. He might have said "its all right," which without more, is non incriminating. He might have merely squeezed her hand, or gave some other assuring statement such as "its going to be alright," or any number of non incriminating statements. Nothing in the record suggests that Mardis advised his wife not to come to the station. Having been advised of his rights, when the wife's statement began to play, Defendant did not request to leave the room, nor did he ask the officers to stop the tape.

Defendant voluntarily sat through the tape in the presence of 6-8 officers and said to his wife "you told the truth." During this period, no officer asked a question or made a statement designed to elicit a response. Admittedly, Everson testified that confronting a suspect with a statement made by someone else that implicates the suspect in criminal conduct is an interrogation technique he routinely employs for the purpose of obtaining a confession from the suspect. (Tr. at 328-30.) The Supreme Court explained in <u>Innis</u>, "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." 446 U.S. at 301. However, the Court must examine the officer's intent along with the objective evidence, and the totality of the circumstances.

As this Court earlier said, there is no reason to believe that Everson reasonably could have expected an incriminating response under the facts of this case. The Court finds credible Everson's testimony that he did not play the recorded statement for Mardis with the intention of eliciting an incriminating statement, but rather because he promised Mrs. Mardis, at her suggestion, that he would do so in exchange for her statement. There was no psychological ploy to extract a statement. Because the Court finds Everson credible on his motivation for playing the tape, the Court finds that this case is analogous to Mauro.

In sum, Mardis was not subjected to the functional equivalent of interrogation after he invoked his right to counsel in violation of the Fifth Amendment. Because his custodial statement was not obtained in violation of Miranda and Edwards, the Court **DENIES** his Motion to Suppress Adoption of Defendant's Wife's Statements as His Own Admission.

Mardis also moves to preclude the government from using at trial Mrs. Mardis' recorded statement, on the grounds that the statement reveals conversations that are protected by the marital communications privilege. Privileges under federal law are governed by the common law as interpreted by case law. Fed. R. Evid. 501. "Federal law recognizes two distinct privileges with regard to spouses: (1) The adverse testimony privilege by which one spouse cannot be forced to testify against the other in a criminal proceeding and (2) the confidential communications privilege, which protects confidential communications between spouses made in confidence during the marriage." United States v. Irons, 646 F. Supp. 2d 927, 952 (E.D. Tenn. 2009) (citing United States v. Porter, 986 F.2d 1014, 1018 (6th Cir. 1993)). "Only the testifying

spouse can assert the adverse testimony privilege, whereas the marital communications privilege can be asserted by either spouse."[2] Id.

"[T]he person asserting the marital privilege has the burden of proving that a communication is a marital communication." Morganroth & Morganroth v. DeLorean, 123 F.3d 374, 383 (6th Cir. 1997). In order for the marital communications privilege to apply, three conditions must exist: "(1) At the time of the communication there must have been a marriage recognized as valid by state law; (2) the privilege applies only to 'utterances or expressions intended by one spouse to convey a message to the other'; and (3) the communication must be made in confidence." Porter, 986 F.2d at 1018 (internal citations omitted).

There is no dispute that at the time the statement was made by Defendant to Mrs. Mardis, they were married, and the statement was meant to be confidential. However, the parties may not divulge the confidential communication to third parties, and thereafter re-cloak it as confidential. This analysis need only look to the plain language definition of "confidential." Merriam-Webster Dictionary defines "confidential" as private or secret.

In the instant case, Mrs. Mardis disclosed a "confidential" communication to law enforcement and asked that they record it. Defendant, the other party to the confidential communication, heard the tape recorded statement, and adopted it as his own, thereby waiving the privilege of confidentiality. The parties to a confidential matter may not persist in discussing the intended "confidential information" with third parties and still proclaim it as "confidential." The Court agrees with the Government that both Defendant and Mrs. Mardis waived their privilege: Mrs. Mardis by disclosing the statement and Defendant by assenting to it, adopting it

---

[2] To the extent Mardis also seeks to preclude the government from calling Mrs. Mardis to testify at trial about her conversation with him, Mrs. Mardis is the only person who can assert that privilege.

as his own admission, and thereby becoming the declarant. Accordingly, the privilege is waived, and the statement is admissible.

Lastly, Defendant's Supplemental Motion to Suppress seeks to suppress post arrest statements made to Everson. After Defendant was arrested, advised of his <u>Miranda</u> rights, and invoked his right to counsel, Everson asked Defendant where they could find the body. In response to Everson's question, Defendant stated "I can't help you…there's nothing left." The Government agreed that the statement could not be used in its case-in-chief at trial. Defendant agreed that their motion was moot.

Based on the foregoing, and after considering the objections filed by Defendant and the Government, IT IS HEREBY ORDERED as follows: Defendant's Motion to Suppress Evidence of Marital Communications; Defendant's Motion to Suppress Evidence of Prior Identifications and Preclude Future In-Court Identifications by Sandra Gahagan; and Defendant's Motion to Suppress Adoption of Wife's Statement are **DENIED**. Defendant's Supplemental Motion to Suppress Post Arrest Statements is Moot.

**IT IS SO ORDERED**, this the 11th day of January, 2011.

s/Bernice Bouie Donald
**BERNICE BOUIE DONALD**
**UNITED STATES DISTRICT JUDGE**